# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**SPARTON ELECTRONICS**
**FLORIDA, INC.,**

      **Plaintiff,**

**v.**                          **Case No.  8:05-cv-1495-T-30TBM**

**ELECTROPAC CO., INC. and**
**ELECTROPAC CANADA, INC.,**

      **Defendants.**

_____/

# ORDER

      THIS CAUSE comes before the Court upon Defendant Electropac U.S.'s Motion for

Summary Judgment (Dkt. 32 ) and Plaintiff's Response in Opposition to the same (Dkt. 34).

## FACTUAL BACKGROUND

      Plaintiff Sparton Electronics Florida, Inc. ("Sparton") is a Florida Corporation

engaged in electronics manufacturing with plants located in Brooksville, Florida and DeLeon

Springs, Florida.  In mid-2001, Sparton's Brooksville plant was a contract manufacturer for

Honeywell International's Aerospace Division.  In this capacity, Sparton was responsible for

manufacturing printed circuit board ("PCB") assemblies for Honeywell which were later

incorporated into enhanced ground proximity warning systems ("GPWS").[1]  The Honeywell

---

[1] A GPWS unit is an electronics product that is installed in aircraft for the purpose of warning pilots
when they are too close to the ground or other objects.  The unit advises the pilot to take emergency action
(continued...)

GPWS production program was referred to by all parties involved as the Honeywell-Redmond Program.

In manufacturing PCB assemblies for Honeywell, Sparton purchased PCBs from a supplier, affixed various components to each PCB, forming a final assembly of PCBs to be shipped to Honeywell and installed in a GPWS unit. Sparton manufactured several different PCB assemblies for Honeywell that included PCBs from various suppliers.

Defendant Electropac Co., Inc. ("Electropac U.S.") is a New Hampshire corporation that operated a PCB manufacturing facility in Manchester, New Hampshire. As of mid-2001, Sparton had been purchasing PCBs from the Manchester facility for use in products Sparton manufactured for customers other than Honeywell.   However, at some time in mid- 2001, Sparton communicated with Electropac U.S. regarding whether Electropac U.S. would be interested in supplying PCBs for the Honeywell-Redmond Program.  To this end, Sparton provided to Electropac U.S. the specification for the types of PCBs needed for the program. After reviewing the specifications, Electropac U.S. informed Sparton it could not meet the required specifications, but suggested that Defendant Electropac Canada,[2] located in Pointe Claire, Quebec, Canada, may be able to manufacture the requisite PCBs.   Pursuant to the

---

[1](...continued)
to avoid a collision.  The system is considered a critical part of the safety systems on commercial and military aircraft, such that the Federal Aviation Authority ("FAA") requires the system be installed in all commercial aircraft operating within U.S. airspace.  Additionally, the GPWS system is subject to strict FAA regulatory requirements regarding its specifications and manufacture.

[2] Electropac Canada is affiliated with Electropac U.S. through a common ownership by a single shareholder, who also owns Electropac U.S. and the parent Canadian Company, Pelchet, Inc., which in turn owns Electropac Canada.

contract between Sparton and Honeywell, any supplier used by Sparton to produce the PCBs had to have its manufacturing facilities approved by Honeywell and be qualified to produce the PCBs to the specifications outlined by Honeywell and approved and adopted by the FAA.

Honeywell undertook efforts to evaluate and assess the suitability of Electropac Canada's plant.  Representatives from Sparton and Honeywell visited Electropac Canada and conducted an audit of its manufacturing facility.  According to Sparton, the information provided to Sparton and Honeywell during this audit appeared to show that Electropac Canada was one of four facilities managed as a single business enterprise, with the Manchester facility (Electropac U.S.) being the "corporate headquarters."[3]

In addition to the facility audit, Electropac Canada was also asked to  provide financial information to Sparton and Honeywell.  The purpose of this request was to provide Sparton and Honeywell with information to assist them in determining whether Electropac Canada was fully able to fund and support the program requirements including any warranty claims that may arise.  According to Sparton, Electropac Canada presented financial information for what appeared to be for the entire "Electropac family of companies." Sparton and Honeywell utilized and relied on this financial information to make their determination.

Based on the audit, it was determined Electropac Canada could meet the program specifications, and in August 2001, Sparton began purchasing PCBs from Electropac Canada

---

[3] There is some disagreement between the parties regarding the information provided during the audit and whether any misrepresentation occurred.  These issues are discussed in greater detail in the Discussion section, below.

for use in printed circuit assemblies for the Honeywell-Redmond Program. Sparton continued purchasing the PCBs from Electropac Canada until 2004. At no time were any PCBs for the program purchased from Electropac U.S.

In July 2004, Electropac Canada and Sparton discussed the possibility of transferring production of the PCBs to the Electropac U.S. factory in Manchester, New Hampshire. This desire to transfer was due in large part to the decrease in the level of business Electropac Canada was experiencing at the time. In response to the requested transfer, on August 10, 2004, Sparton and Honeywell conducted an audit of the U.S. Manchester facility. The audit involved an on-site visit by both Sparton and Honeywell. Honeywell and Sparton examined the Manchester facility's ability to manufacture the requisite PCBs, and after conducting the audit, it was determined the U.S. Manchester plant did not have the capability.

During this period, an issue arose regarding whether Electropac Canada was complying with the coupon design and cross-section testing requirements, specifically that Electropac Canada had not been complying with the program specifications. Upon learning of Electropac Canada's noncompliance with the coupon and testing requirements, Honeywell and Sparton sought confirmation from Electropac Canada that it had changed its process in order to, going forward, fully comply with the Honeywell specification requirements. In response, Electropac Canada indicated it would change its present process only if Sparton agreed to pay a higher price for the PCBs. Honeywell subsequently determined it no longer desired to use Electropac Canada as a PCB supplier, and in November 2004, Sparton cancelled all outstanding PCB orders with Electropac Canada.

Soon after terminating the relationship with Electropac Canada, it was discovered by Honeywell that various products on its manufacturing line containing Electropac Canada's PCBs were  cracked or exhibited open vias.[4]  These open vias prevented electrical current from traveling between the layers of the PCB.  Additionally, Honeywell received reports of field failure relating to GPWS units containing Electropac Canada's PCBs.

On May 6, 2005, Honeywell informed Sparton it was asserting a warranty claim in excess of $3,000,000.00 against Sparton for the costs it incurred as a result of the nonconforming Electropac Canada PCBs.  Sparton thereafter notified Electropac Canada and Electropac U.S. it would seek reimbursement for its costs.    According to Sparton, after receiving said notification of Sparton's claim, the sole shareholder and President of both Electropac U.S. and Electropac Canada, Raymond Boissoneau, transferred the manufacturing work being performed by Electropac Canada to other facilities in the "Electropac family of companies."  The assets of Electropac Canada where thereafter liquidated.  Subsequently, Sparton filed a four count Amended Complaint asserting claims against Electropac Canada and Electropac U.S. for breach of contract, breach of warranty, indemnification and fraudulent misrepresentation.   In the Amended Complaint, Sparton alleges Electropac U.S. is liable for the actions of Electropac Canada  on the grounds Electropac U.S. was acting as the "alter ego and/or agent" of Electropac U.S. In its Motion for Summary Judgment, Electropac U.S. seeks judgment on all claims.

---

[4] Once the PCBs were made, hundreds of small holes, called "vias," were drilled through the layers of the PCB.  The PCBs were then plated with copper.  The copper flowed into the vias and allowed an electrical connection to occur between the different layers of the PCB.

## DISCUSSION

**A.     Summary Judgment Standard.**

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. <u>See</u> Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). The moving party bears the burden of meeting this rather exacting standard. <u>See</u> <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).  In applying this framework, the evidence, and all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party. <u>See</u> <u>Arrington v. Cobb County</u>, 139 F.3d 865, 871 (11th Cir.1998); <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir.1997).

Equally clear, however, is the principle that the nonmoving party bears the burden of coming forward with evidence of each essential element of their claims, such that a reasonable jury could find in his or her favor. <u>See</u> <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1080 (11th Cir.1990). The nonmoving party "[m]ay not rest upon the mere allegations and denials of [its] pleadings, but [its] response ⋯ must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>see</u> <u>also</u> <u>LaChance v. Duffy's Draft House, Inc.</u>, 146 F.3d 832, 835 (11th Cir.1998) ("Summary judgment may be granted if the evidence is 'merely colorable.'") (quoting <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct.

2505). Further, and significantly, mere conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment. See Earley, 907 F.2d at 1081. The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. See Celotex, 477 U.S. at 322.

**A.      Alter Ego Liability.**

The parties agree New Hampshire law applies to this issue of alter ego liability. Under New Hampshire law, in order to avail itself of the alter ego doctrine, a plaintiff must establish that the corporate entity was used to promote an injustice or a fraud. Village Press, Inc. v. Stephen Edward Company, Inc., 120 N.H. 469,471 (N.H. 1980).   Allegations of injustice or fraud which may support the piercing of the corporate veil include those instances where a "shareholder suppresses the fact of incorporation, misleads his creditors as to the corporate assets, or otherwise uses the corporate entity to promote injustice or fraud." Druding v. Allen, 122 N.H. 823, 827 (N.H. 1982) (citation omitted).   Defendant Electropac U.S. argues that Sparton has failed to adequately establish alter ego liability because it has failed to produce any evidence that the Defendants were sham entities and that they promoted an injustice or fraud using the corporate form. See Northern Laminate Sales, Inc. v. Matthews, 249 F. Supp. 2d 130, 141 (D.N.H. 2003)(citations omitted).    Sparton argues that the representations made to it and Honeywell during the audit as well as the

documents presented at the time of the audit evidence an attempt by the Defendants to mislead Sparton and Honeywell in order to become a supplier for the Honeywell-Redmond program.

In reviewing the record, specifically with regard to the slide show presentation and the financial information presented during the audit, an issue of fact exists as to whether Sparton and Honeywell were misled by Electropac Canada and Electropac U.S. to believe the companies were run as a single enterprise.

**Slide Show Presentation.**

Attached to the Affidavit of Robert Suber, Sparton's Corporate Commodities Manager, are slides from a slide show presentation presented to Sparton and Honeywell during their assessment of the Canadian facility. (Dkt. 34-6).   The first slide states, "Welcome to Electropac Family of Companies [:] A privately owned-financially independent printed circuit board manufacturer, four independent facilities with individual specialties." (Dkt. 34-6).  The slide show continues by providing information about each of the four independent "facilities," with the Manchester, New Hampshire facility being labeled as "corporate headquarters." (Dkt. 34-6 at 2-5).  It is arguable that the first slide along with the designation of the New Hampshire facility as "corporate headquarters" supports Sparton's claim that the Electropac family of companies was held out as a single business entity.  In addition, the remaining slides, some of which are entitled "Corporate Strategies," "Corporate Market Segments," and   "Corporate Wide Sales," offer support for the position that

Defendants, at the time the assessment was being made, were holding themselves out as separate facilities of one business entity.  While it is true the slide show does not specifically state the companies are run as a single business enterprise, in reviewing the information on the slides, a fact finder could determine that it was reasonable for Honeywell and Sparton to presume that Defendants were a single business enterprise.

### Financial Information.

In addition to the slide show presentation, Electropac Canada also submitted financial documentation to Sparton and Honeywell.  During oral argument, counsel for Electropac U.S. stated that during the audit, Honeywell and Sparton were provided Supplier Financial Information which detailed the financial status of both Electropac U.S. and Electropac Canada for the preceding three fiscal years.  According to counsel for Electropac U.S., because separate financial information was submitted, and a notation was made on the sheets identifying the company for which the financial information was associated, any confusion had by Sparton or Honeywell as to the financial status of Electropac Canada was unreasonable and didn't rise to the level of being misleading.  This Court disagrees.

In reviewing the Supplier Financial Information sheets, there is nothing specifically indicating that the financial information for Electropac Canada was to be evaluated separately from that of Electropac U.S..  For example, the notation on the financial information sheet states, "[a]bove data is *site* specific (Elactropac [sic] Canada) -Montreal." (Emphasis added).  It is arguable that had Electropac Canada and Electropac U.S.  intended

to be forthcoming regarding their financial data, a notation could have been made that the assets were those of a separate corporation rather than the assets of the Canadian "site." This distinction, however, was not made. Taking the financial data together with the slide show presentation, it is arguable a finder of fact could determine that Electropac U.S. and Electropac Canada presented misleading information to Honeywell and Sparton, and that based on the information, Sparton and Honeywell were led to believe the companies were run as a single business enterprise with the entirety of their assets being available to satisfy any claim made by Sparton.

**B.     Agency Liability.**

Defendant also argues that Plaintiff has failed to sufficiently establish agency liability between Electropac U.S. and Electropac Canada. The parties have also agreed that New Hampshire law applies to the agency issue. Under New Hampshire law, in order to establish an agency relationship, a plaintiff must allege: (1) authorization from the principal that the agent shall act for him or her; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions. See Herman v. Monadnock PR-24 Training Council, 147 N.H. 754,758 (N.H. 2002). Sparton has produced no evidence that Electropac U.S. authorized Electropac Canada to act on its behalf. While Electropac U.S. did refer Sparton to the Canadian facility, there is no evidence that any express, implied or apparent instructions were given by Electropac U.S. to Electropac Canada to act as its

agent with regard to the Honeywell program.  Accordingly, summary judgment as to agency liability is granted.

It is therefore ORDERED AND ADJUDGED that Defendant Electropac U.S.'s Motion for Summary Judgment (Dkt. 32 ) is **DENIED in part and GRANTED in part** as stated herein.

**DONE** and **ORDERED** in Tampa, Florida on August 9, 2007.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Odd\2005\05-cv-1495 - Def's Motion for Summary Judgment.wpd